**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
-----------------------------------------------------------------------x
**MICHELLE P. TIEN,**

                     **Plaintiff,**                     **Civil Action No.**

                    **-against-**

**TRUSTLY, INC.,**                               **COMPLAINT**

                     **Defendant.**                 **Jury Trial Demanded**
-----------------------------------------------------------------------x

Plaintiff, by her attorneys, Tuckner, Sipser, Weinstock & Sipser, LLP, respectfully complains as follows:

## **PARTIES**

1.      Plaintiff Michelle Tien is a female of Chinese descent and a New Jersey resident whose address is 506 Glen Ridge Drive South, Bridgewater, NJ 08807.

2.      Defendant Trustly, Inc. is a Delaware corporation headquartered at 555 El Camino Real, Suite 200, San Carlos, CA 94070. Defendant was Plaintiff's Employer as provided under the applicable laws. Defendant Trustly, Inc., ("Trustly" or "Defendant") is part of the Trustly Group.

## **PRELIMINARY STATEMENT**

3.      This action arises under the New Jersey Law Against Discrimination, including the New Jersey Equal Pay Act (N.J.S.A. 10:5-1 et seq., "NJLAD"), and the New Jersey Conscientious Employee Protection Act (N.J.S.A. 34:19-1 et seq., "CEPA"), seeking economic damages for substantial harms and losses Plaintiff suffered due to Defendant's discriminatory employment

actions and retaliatory wrongful discharge. These actions were based on her sex, national origin, race, and her protected opposition to Defendant's illegal employment practices.

## JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332, in that the parties are residents of different states, and the amount in controversy exceeds $75,000.00.

5.      Venue is proper in this Court as Plaintiff was employed by Defendant in New Jersey.

## ALLEGATIONS OF FACT

6.      Plaintiff was hired by Trustly as Vice President, People & Operations in October 2020.

7.      Plaintiff, a graduate of The Wharton School, University of Pennsylvania, had amassed nearly 30 years of successful leadership experience as a senior executive in companies spanning from startups to Fortune 500 financial services and consulting firms prior to joining Trustly.

8.      In her pivotal role, Plaintiff was instrumental to Defendant's rapid North American business expansion, escalating the workforce from 80 to over 400 employees across the U.S., South America, and Europe. Her leadership forged a high-performing HR team, pivotal in driving the company's growth. She spearheaded the comprehensive expansion of Trustly's infrastructure, enhancing management systems, policies, and procedures to support this growth. Her efforts not only facilitated seamless scaling but also established a robust foundation for Trustly's ongoing expansion and operational excellence.

9.      During the coronavirus pandemic, Plaintiff steered the company through several corporate structure shifts, four CEO/President transitions, international cross-cultural challenges, and a greater-than-50 percent turnover in Defendant's Americas Leadership Team.

10. Plaintiff consistently worked long hours, took few days off, pulled many all-nighters, and was an incontrovertibly devoted, diligent, and productive employee who added value to Trustly.

11. However, Plaintiff soon realized that she would never truly be valued on the Leadership Team because she is a woman when, especially at the top, Trustly's Leadership Team is firmly entrenched in the hyper-masculine, misogynistic, male-dominated "*tech-bro*"[1] culture.

12. Shortly after the commencement of her employment, Plaintiff realized that she was significantly underpaid relative to known technology industry market compensation benchmarks.

13. Plaintiff also realized that she was significantly underpaid in relation to the compensation that comparator male colleagues on the Trustly Americas Leadership Team were paid relative to their own market compensation benchmarks, thereby evincing substantial gender pay inequity.

14. A March 2021 report by ClearBridge Compensation Group, an esteemed external specialist consulting firm, showed that Plaintiff, even from her time of hire, was the lowest-paid individual on the 9-member Leadership Team, with the exception of Trustly's then-President, John McLane, whose compensation package included significantly more equity in the company.

15. Furthermore, when ranked, three out of the four lowest-paid Leadership Team members were women: Wendy Roberts, VP Risk, Chief Legal Officer Kathryn McCall, and Plaintiff.

16. Throughout Plaintiff's employment, sex-based disparities persisted, despite Defendant's purported compensation philosophy and goal of paying employees above market benchmark rates, specifically aiming for the top 75th percentile in industry market compensation standards.

---

[1] Upon information and belief, the term "tech-bro" pejoratively describes a culture within certain technology-focused companies or industries, characterized by a predominance of white, male employees who often display privilege and a significant insensitivity or lack of empathy towards diversity, equality, and inclusion of others. This culture fosters an exclusive or alienating environment, particularly detrimental to those not fitting this demographic, undermining the principles of inclusivity and respect in the workplace.

17.     Excluding the company's founders, Alexandre Gonthier and Chief Technology Officer Ezio Fernandes, with significant founders' equity shares, male members of the Leadership Team consistently earned compensation more closely aligning with the company's aim of paying at the 75th percentile of market benchmarks. In stark contrast, women executive leaders at Defendant were compensated significantly below their male counterparts.

18.     Yet, every male Leadership Team member, performing work substantially similar to Plaintiff as the top-most executive leader of a corporate function that required comparable skill, effort, and responsibility, was consistently compensated nearer to the 75th percentile of their respective market compensation benchmarks. This marked pay disparity made clear to Plaintiff that she and her women colleagues on the Leadership Team were subjected to sex-based discriminatory compensation practices in clear violation of New Jersey law.

19.     However, the most recent pay equity audit conducted by a compensation specialist in September 2022 revealed that Plaintiff was compensated at approximately the 32nd percentile of national benchmarks, while McCall received less than the 25th percentile for her role's standards.

20.     Beginning in early 2021, Plaintiff repeatedly brought this stark pay disparity to the attention of her supervisor, Defendant's President, John McLane, both in person and by email.

21.     Plaintiff raised the issue of Defendant's unequal pay practices in meetings with McLane on February 12, 2021, and April 30, 2021, as well as via email on April 30, 2021.

22.     McLane then retaliated against Plaintiff by continually deferring any response to Plaintiff's protected requests to correctively increase her compensation by pretextually indicating that he wanted to address her complaint as part of a full Leadership Team compensation review.

23.     More than a year later, Defendant still had not investigated Plaintiff's civil rights complaint, nor conducted a pay equity audit to resolve the gender pay gap between Plaintiff's

compensation and that of her male comparators. This ongoing discriminatory inaction continued despite McLane promoting Plaintiff from Vice President to Senior Vice President in April 2022.

24. Despite her nominal promotion to Senior Vice President, Plaintiff's compensation remained the same as it was at the lower Vice President level, which was significantly below industry standards, and considerably less than the salaries of her Trustly male counterparts.

25. Similarly, Plaintiff's female colleague, Wendy Roberts, was promoted to Senior Vice President in April 2022, yet received no salary increase for her SVP role at that time.

26. Promotions without salary increases disproportionately impacted women on Defendant's Leadership Team, clearly diverging from Defendant's standard operating procedures and the established best practices for pay audits that aim to ensure corporate equal pay.

27. Despite her efforts, performance, and leadership, Defendant only finally provided Plaintiff with her first and only salary increase *two years* to the month from when she was hired, a clear anomaly in a fast-growing company that conducts performance reviews every 6 months.

28. Plaintiff is unaware of any other non-commissioned employees at Defendant's US firm who were employed for two years without a salary increase, especially within senior Leadership.

29. On multiple occasions between April 2022 and September 2022, Plaintiff informed John McLane and Alexandre Gonthier--both white males--that Defendant was engaging in illegal sex-based unequal pay practices, and that the belated salary increases due and owing to Wendy Roberts and to Plaintiff should be implemented and made retroactive to April 1, 2022.

30. Plaintiff specifically informed Defendant, through McLane and Gonthier, that it was violating federal and state law by failing to rectify its sex-based discriminatory pay practices.

31. Gonthier acknowledged this violation, but later willfully disregarded it and declined to make the promotion raises retroactive, despite his initial promises and assertions to the contrary.

32. In October 2022, Gonthier resumed his role as CEO, and the misogynistic culture and its concomitant inequities toward women became increasingly blatant and overtly discriminatory.

33. On February 3, 2023, Plaintiff highlighted her pay disparity to Gonthier in a one-on-one discussion and she advocated for pay equity corrective action in the next April 2023 pay cycle.

34. On February 7, 2023, in preparation for her performance review scheduled for February 10, 2023, Plaintiff submitted her required Employee Self-Assessment document to McLane, wherein she again actually notified Defendant of its gender-specific and unjust gender pay disparity practices that was negatively affecting her, and she explicitly noted in writing, *"I need to be paid competitively and have my work valued—I have concerns about both."*

35. On February 10, 2023, McLane entered Plaintiff's outstanding performance evaluation into Defendant's performance management software, awarding Plaintiff an overall rating of 5—the highest possible—on a scale of 1 to 5—as Plaintiff's performance was objectively excellent.

36. Despite these exceptionally positive performance ratings, on February 10, 2023, McLane informed Plaintiff that her role was ostensibly being *"eliminated,"* effective March 3, 2023.

37. McLane tried to justify Gonthier's unilateral decision to terminate Plaintiff as a business restructuring move, a clear attempt to cover up its illegal, discriminatory, and retaliatory actions, despite Plaintiff's undeniably excellent performance and her significant contributions to Trustly.

38. On February 15, 2023, Plaintiff reiterated her sex-based discrimination claim to McLane, citing unequal pay and retaliatory discharge, underscored by her unmatched performance and the timing of her complaints to Gonthier and McLane, leading to her wrongful termination.

39. On the evening of February 15th, immediately following her protected invocation, Defendant retaliated against Plaintiff in a clear backlash for asserting her claims of disparate treatment. In an attempt to justify the wrongful termination, McLane manufactured pretext by

significantly lowering all of Plaintiff's performance scores, including a revision of her overall score from a 5 (distinguished) to a 3 (valued), and added unfounded commentary under the pretext of alleging a lack of functional knowledge and abilities in her HR responsibilities.

40. This retroactive reduction in performance scores also precluded Plaintiff from receiving an approximately $69,000 performance bonus for 2022, which she had clearly already earned.

41. Plaintiff's firing, both discriminatory and retaliatory, was intentionally and strategically timed to occur before a significant November 2023 revision of Defendant's long-term incentive program (LTIP). This revision would have markedly improved the terms of Plaintiff's equity options as a Trustly employee, leading to her considerable financial harm and loss.

42. Before her retaliatory discharge, Plaintiff was eligible for a new share issuance, affirming her value to the company. These promised benefits, signaling her expected ongoing role, were revoked upon her firing, highlighting the punitive nature of her dismissal and its significant economic repercussions.

43. Moreover, Plaintiff's termination for challenging Defendant's unlawful employment practices not only revoked her eligibility for a new share issuance but also significantly devalued her existing equity and jeopardized substantial LTIP benefits. This was particularly impactful as Defendant is planning a change of control event by 2024 or 2025, which could have realized over $2 million in LTIP payouts for Plaintiff, a relatively long-tenured senior executive. These illegal actions by Defendant not only deepened her economic losses but also underscored the retaliatory nature of her dismissal for opposing pay practices violations.

44. Notably, Plaintiff was the *only* employee terminated at that time, underscoring the pretextual nature of the alleged reduction in force that McLane falsely referred to when he informed Plaintiff that her position was being eliminated as a purported cost-saving measure.

45. Despite justifying Plaintiff's termination as an ostensible cost-saving measure, Defendant subsequently increased C-suite expenses, aligning with its white male-dominated culture. Shortly after Plaintiff's dismissal, CEO Gonthier elevated a recently hired, well-compensated white male from the Leadership Team directly to the C-suite—a rare two-level jump significantly boosting his pay, against Plaintiff's HR advice, and highlighting systemic male executive preference. Soon after, by adding and retaining another white male in the C-suite, Defendant intensified executive level white male dominance and costs, thus revealing its pretextual, discriminatory motives.

46. These actions highlighted the gender-based disparity in treatment, especially when contrasted with Plaintiff's reduced pay and retaliatory termination due to her sex.

47. Plaintiff, despite her role as head of Human Resources, was aware that Defendant had a history of awarding discretionary out-of-cycle cash spot bonuses to male employees—separate from and in addition to their standard incentive compensation—without her consultation or consent, decisions made solely at the discretion of Gonthier or McLane.

48. However, neither Plaintiff nor any other woman employee ever received a cash spot bonus from Defendant, underscoring Trustly's pattern of discriminatory compensation practices. This perpetuated a clear and sex-based disparity in pay among executives, significantly affecting the compensation of Plaintiff and her female counterparts on the Leadership Team.

49. Upon being notified of illegal sex discrimination, Defendant's management, marked by entrenched sexism, failed to investigate Plaintiff's gender-based civil rights complaints.

50. Moreover, Defendant ignored her protected grievances about unequal pay, revealing a blatant disregard for the systemic bias that both Gonthier and McLane exhibited.

51. Rather than addressing the issue, Defendant retaliated against Plaintiff, fully aware of her exercise of civil rights under Title VII, LAD, and CEPA by opposing discriminatory practices.

52.     Plaintiff's wrongful discharge, a clear act of retaliation, occurred just three days after her latest complaint of disparate treatment, directly linking her protected activity to the final, tangible adverse employment action. Subsequently, on February 24, 2023, after her unlawful termination, Plaintiff formally reiterated in writing her sex discrimination complaints and specifically addressed the retaliatory nature of her dismissal, underscoring its direct connection to her opposition to Trustly's illegal practices of sex discrimination and unequal pay.

53.     Under Gonthier's leadership, the promotion of a white male-dominated, exclusionary environment became unmistakably clear, particularly after Plaintiff's wrongful termination. This trend was underscored by the dismissals of the only other Asian executives: Senior VP of Engineering Ron Pragides on September 19, 2023, and Aaron Masih, Vice President and Head of Customer Success North America, who was notified of his termination around July 18, 2023. These actions highlight a pattern of discrimination, emphasizing the shift towards a less inclusive culture within the company's leadership.

54.     These actions, far from isolated, marked a clear trend. Within just 11 months of Gonthier's tenure as CEO, Defendant systematically ousted its three most senior Asian employees—Plaintiff, Pragides, and Masih. This intentional exclusion led to a marked lack of Asian presence in Trustly's extant majority white male-dominated Leadership and Extended Leadership Teams, vividly highlighting a deeply troubling pattern of racial and national origin discrimination, evidencing a blatant disregard for diversity at executive levels.

55.     Defendant's actions constitute knowing, willful, and deliberate violations of the New Jersey Law Against Discrimination and the Conscientious Employee Protection Act. These actions not only represent illegal discrimination and retaliation against Plaintiff but also culminated in her wrongful dismissal under both the CEPA and the NJLAD.

**HARMS AND LOSSES**

56. Plaintiff has suffered considerable financial losses as a direct consequence of Defendant's unlawful and discriminatory conduct. These losses include not only her immediate job loss but also diminished future employment prospects, lost fringe benefits, and a rightfully earned monetary bonus for 2022 that was never awarded.

57. Exacerbating Plaintiff's financial distress, Plaintiff experienced a significant devaluation of her stock shares and options in Defendant's company, and Plaintiff was deprived of the opportunity to acquire additional equity, which was previously promised to her.

58. Beyond financial losses, Plaintiff has endured profound mental anguish and emotional distress, significantly impacting her well-being. This distress is not merely subjective; it has been corroborated by medical professionals, indicating severe impact beyond ordinary stress or upset, and has led to substantial harm to her personal and professional reputation, not only since Plaintiff's unlawful termination, but also with significant, long-term impact to her career and ability to earn comparable, executive-level income going forward.

**FIRST CAUSE OF ACTION**
Violation of the New Jersey Equal Pay Act (N.J.S.A. §10:5-12(t))

59. Plaintiff reincorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

60. The New Jersey Equal Pay Act mandates equal compensation for substantially similar work across protected classes. It is unlawful for an employer to compensate employees of one sex less than the other for substantially similar work when viewed as a composite of skill, effort, and responsibility.

61. Defendant violated the New Jersey Equal Pay Act by compensating Plaintiff and similarly situated women executives less than their male counterparts for substantially similar work, neglecting to adjust Plaintiff's salary upon her promotion, and excluding Plaintiff from receiving cash spot bonuses awarded to male colleagues.

62. This conduct by Defendant not only violates the New Jersey Equal Pay Act but also constitutes a willful, wanton, and egregious violation of the New Jersey Law Against Discrimination (NJLAD), justifying an award of punitive damages to Plaintiff.

63. Pursuant to N.J.S.A. §10:5-13(a)(2)(d), Plaintiff is entitled to treble damages for the willful violation of her rights under NJEPA.

## SECOND CAUSE OF ACTION
### Sex Discrimination under the NJLAD (N.J. Stat. §10:5-12(a))

64. Plaintiff reincorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

65. The NJLAD prohibits discrimination in compensation or terms, conditions, or privileges of employment based on sex.

66. Defendant engaged in unlawful employment practices by discriminating against Plaintiff in compensation and by creating a hostile work environment, culminating in Plaintiff's wrongful termination due to her sex.

67. Defendant's discriminatory conduct was willful, wanton and especially egregious, entitling Plaintiff to an award of punitive damages.

11

## THIRD CAUSE OF ACTION
Race Discrimination under the NJLAD (N.J.S.A. §10:5-12(a))

68.     Plaintiff incorporates all preceding paragraphs of this Complaint as if fully set forth herein at length.

69.     N.J.S.A. §10:5-12(a) also prohibits employment discrimination based on race. Defendant's termination of Plaintiff, among other actions, violated this statute.

70.     Plaintiff seeks damages, reinstatement, and other equitable relief for the harm suffered due to Defendant's discriminatory actions.

71.     Defendant's discriminatory conduct was willful, wanton and especially egregious, entitling Plaintiff to an award of punitive damages.

## FOURTH CAUSE OF ACTION
National Origin Discrimination under the NJLAD (N.J.S.A. §10:5-12(a))

72.     Plaintiff reincorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

73.     Under N.J.S.A. §10:5-12(a), discrimination on the basis of national origin is prohibited. Defendant's conduct towards Plaintiff and the dismissal of other Asian employees, constitutes national origin discrimination.

74.     This pattern of discrimination against Plaintiff and other Asian employees demonstrates Defendant's systemic bias and violates NJLAD. Plaintiff seeks compensation for losses and damages resulting from Defendant's unlawful conduct, including but not limited to back pay, damages, reinstatement, and other equitable relief.

75.     Defendant's discriminatory conduct was willful, wanton and especially egregious, entitling Plaintiff to an award of punitive damages.

## FIFTH CAUSE OF ACTION
Retaliation under the NJLAD (N.J.S.A. §10:5-12(d))

76. Plaintiff reincorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

77. N.J.S.A. §10:5-12(d) prohibits retaliatory actions against any person for opposing practices forbidden under the NJLAD. Defendant retaliated against Plaintiff for her repeated requests for equal pay and for her opposition to Defendant's discriminatory pay practices.

78. Defendant engaged in an unlawful employment practice prohibited by the NJLAD by retaliating against and firing Plaintiff because she opposed Defendant's discriminatory practices.

79. Plaintiff seeks damages, including punitive damages, for Defendant's retaliatory actions. Defendant's discriminatory conduct was willful, wanton and especially egregious, entitling Plaintiff to an award of punitive damages.

## SIXTH CAUSE OF ACTION
Whistleblower Retaliation under the New Jersey Conscientious Employee Protection Act
(CEPA, N.J.S.A. §34:19-3)

80. Plaintiff incorporates all preceding paragraphs of this Complaint as if fully set forth herein at length.

81. N.J.S.A. §34:19-3 protects employees from retaliatory actions for disclosing, objecting to, or refusing to participate in activities, policies, or practices that the employee reasonably believes are in violation of a law or are against public policy. Defendant's termination of Plaintiff in retaliation for her opposition to unequal pay is whistleblowing activity in violation of CEPA. Plaintiff seeks reinstatement, back pay, damages for emotional distress, and punitive damages for Defendant's violation of CEPA.

13

82. The adverse employment actions taken by Defendant against Plaintiff lacked any legitimate or lawful justification. Any reasons put forth by Defendant for these actions are merely pretextual, serving to conceal the true retaliatory motive behind Plaintiff's dismissal.

83. The actions undertaken by Defendant represent a flagrant violation of the New Jersey Law Against Discrimination and the Conscientious Employee Protection Act.

84. These deliberate and willful acts of discrimination, retaliation, and wrongful dismissal under CEPA not only undermine Plaintiff's civil rights in relation to equal pay and disparate treatment but also reflect a blatant disregard for the legal protections afforded to employees.

85. Such conduct underscores the necessity for judicial intervention to uphold these fundamental rights.

86. Defendant's retaliatory actions were willful, wanton and especially egregious, entitling Plaintiff to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the Court to:

A. Award damages for lost future earnings, salary increases, retirement income, equity shares, and options, reflecting the full spectrum of Plaintiff's losses due to Defendant's wrongful termination.

B. Compensate Plaintiff for past and future financial losses, including back pay and benefits, to restore her to the position she would have been in absent Defendant's unlawful conduct.

C. Award compensatory damages for severe mental anguish, emotional distress, and harm to Plaintiff's professional reputation resulting from Defendant's actions.

D.     Impose punitive damages on Defendant for its willful, wanton, and egregiously unlawful conduct, to deter future violations.

E.     Grant Plaintiff all reasonable legal fees, court costs, and expenses incurred in pursuing this action.

F.     Provide any other relief deemed just and equitable by the Court to fully remedy the harms caused by Defendant's illegal employment practices.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all triable issues.

Dated:  New York, NY
          February 9, 2024

Respectfully submitted,

**Tuckner, Sipser, Weinstock & Sipser, LLP**

By: s/ William J. Sipser
    William J. Sipser (WS 1781)
    Attorneys for Plaintiff
    535 Fifth Avenue 4th Floor
    New York, NY 10017
    212.766.9100
    wsipser@womensrightsny.com